IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

|  |  |  |
|---|---|---|
| KENNETH BLANKENSHIP, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Civil Action No. 1:17-cv-1359-LO-MSN |
| | ) | |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## REPORT AND RECOMMENDATION

On December 20, 2013, Kenneth Blankenship ("Plaintiff") applied for disability insurance benefits under the Social Security Act ("Act"), claiming that he became disabled as of December 6, 2013.  Tr. 15, 66, 156–57, Mem. in Support of Pl.'s Mot. for Summ. J. [hereinafter Pl.'s Mem.] at 2 (Dkt. No. 11).  The Social Security Administration ("SSA") denied Plaintiff's claims both initially and upon reconsideration.  Thereafter, an Administrative Law Judge ("ALJ") denied Plaintiff's claims in a written decision, and the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision as the final decision of the Commissioner.

Plaintiff now seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g), arguing that the ALJ erred in assessing his residual functional capacity, evaluating his credibility, and finding him capable of performing past relevant work.  Pl.'s Mem. at 4–23.  This matter now comes before the Court on Plaintiff's Motion for Summary Judgment (Dkt. No. 10) and Memorandum in Support (Dkt. No. 11), Defendant's Motion for Summary Judgment (Dkt. No. 12) and Memorandum in Support (Dkt. No. 13), and Defendant's Opposition to

Plaintiff's Motion for Summary Judgment (Dkt. No. 14).  For the reasons that follow, the Court recommends that Plaintiff's Motion for Summary Judgment be DENIED, that Defendant's Motion for Summary Judgment be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

## I.   Procedural History

The SSA denied Plaintiff's application for disability insurance benefits—initially on August 30, 2014, and again upon reconsideration on November 20, 2014.  Tr. 66–87, 91–95, 97–101.  At Plaintiff's request, the ALJ held a hearing on October 6, 2016.  Tr. 103–04, 130–153.  On January 11, 2017, the ALJ issued a written opinion, denying Plaintiff's claims and concluding that Plaintiff did not qualify as disabled under the Act because Plaintiff has the residual functional capacity—the most he can do despite his physical and mental limitations—to complete light work and is thus capable of performing his past relevant work as a real estate agent, procurement agent, and cashier.  20 C.F.R. § 416.945(a)(1); Tr. 12–22.  Plaintiff sought review by the Appeals Council, which declined to take the case on September 25, 2017.  Tr. 1–5.  This appeal followed pursuant to 42 U.S.C. § 405(g).

## II.   Legal Standard

In reviewing a decision of the Commissioner, district courts are limited to determining whether the Commissioner's decision was supported by substantial evidence on the record, and whether the proper legal standard was applied in evaluating the evidence.  *See* 42 U.S.C. § 405(g); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). When evaluating whether the Commissioner's decision is supported by substantial evidence, "it is not within the province of a

reviewing court to determine the weight of the evidence, nor is it the court's function to substitute its judgment for that of the Secretary." *Hays*, 907 F.2d at 1456. "Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence." *Id.* (citing *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979)).   If supported by substantial evidence, the Commissioner's findings as to any fact are conclusive and must be affirmed. *See* 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  While the standard is high, where the ALJ's determination is not supported by substantial evidence on the record, or where the ALJ has made an error of law, the district court must reverse the decision.  *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

Determining whether an applicant is eligible for disability insurance benefits under the Social Security Act entails a "five-part inquiry" that "asks: whether (1) the claimant is engaged in substantial gainful activity; (2) the claimant has a medical impairment (or combination of impairments) that are severe; (3) the claimant's medical impairment meets or exceeds the severity of one of the impairments listed in Appendix I of 20 C.F.R. Part 404, subpart P; (4) the claimant can perform [his] past relevant work; and (5) the claimant can perform other specified types of work." *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006).

## III.    ALJ's Decision

The ALJ followed the five-step evaluation process established by the Social Security Act in analyzing Plaintiff's disability claim.  Tr. 15–22.  At step one, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2018.  Tr. 17. At step two, the ALJ determined Plaintiff had not engaged in substantial gainful activity since December 6, 2013.  *Id.*  At step three, the ALJ identified Plaintiff's degenerative disc disease,

3

anemia, plantar fasciitis, right elbow epicondylitis, right shoulder impingement, asthma, and chronic pain as severe impairments "because they significantly limit[ his] ability to perform basic work activities" but noted that Plaintiff's diverticulosis, sleep apnea, high cholesterol, bilateral Eustachian tube dysfunction, hernia, obesity, migraines, urinary incontinence, and abnormal testosterone were not because they "minimally affect the claimant's ability to engage in basic work activities." *Id.* First, the ALJ stated that Plaintiff's gastric complaint, low testosterone, and cholesterol were all treated with medication. *Id.* Second, Plaintiff was not compliant with his sleep apnea treatment, suggesting that this condition was not as severe as alleged. *Id.* Third, Plaintiff's Eustachian tubes and hernia were surgically fixed, and he had previously worked while he had urinary incontinence before the alleged onset date. Tr. 18. Finally, the ALJ determined that Plaintiff's migraines were not severe because he currently takes the same medication for them as he did while working and does not suffer from side effects that would otherwise prevent him from substantial gainful activity. *Id.*

In assessing Plaintiff's residual functional capacity under step four, the ALJ found that Plaintiff could perform light work and occasionally push and pull with the right upper extremity, frequently reach overhead, handle, and finger with the right upper extremity, occasionally climb ramps and stairs but never ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, and crouch but never crawl. *Id.* Plaintiff could not, however, be exposed to fumes, odors, dusts, and gases. *Id.* The ALJ acknowledged that Plaintiff's medical impairments could cause the alleged symptoms, but that his statements regarding their intensity, persistence, and limiting effects were not consistent with evidence in the record. Tr. 19. The ALJ assigned great weight to the reports of the state agency physicians, little weight to Dr. Al-Muhannad Al-Hammood's

opinion that Plaintiff's ability to work is "greatly imped[ed]" by his symptoms and medication, and little, if any, weight to Plaintiff's testimony.  Tr. 20–21.

The ALJ found Plaintiff capable of performing past relevant work as a real estate agent, procurement agent, and cashier, and therefore, the ALJ did not proceed to step five.  Tr. 21. Given the above analysis, the ALJ concluded that Plaintiff did not qualify as disabled under the Social Security Act.

## IV.   Analysis

Plaintiff, who is currently 64 years old, appeals to this Court, alleging that the ALJ erred by not adequately addressing (1) his plantar fasciitis, (2) migraines, (3) medical and nonmedical evidence to support his decision and (4) the combination of Plaintiff's impairments, and by also (5) according great weight to the state agency physicians' opinions and (6) little to no weight to Plaintiff's subjective complaints, and (7) not properly assessing Plaintiff's past relevant work. *See* Pl.'s Mem. at 4–23.  For the reasons set forth below, the ALJ did not err in his decision.

### A.   Plaintiff's Residual Functional Capacity

#### 1.   Plantar Fasciitis

Plaintiff first argues that the ALJ did not discuss the limitations faced by Plaintiff which can be attributed to his plantar fasciitis.  Tr. 7–8.  He states that by finding plantar fasciitis a severe impairment, the ALJ must have established that it significantly impedes his ability to work; yet, the ALJ did not engage in such analysis and ultimately concluded otherwise.  *Id.*  In reviewing a claimant's abilities, an ALJ must first assess the nature and extent of the claimant's physical and mental limitations and then determine the claimant's residual functional capacity for work on a regular and continuing basis.  20 C.F.R. §§ 404.1545(b), 416.945(b).  Generally, the claimant bears the responsibility to provide the evidence that the ALJ uses in making this

determination; however, before deciding that a claimant is not disabled, the ALJ must develop the claimant's complete medical history, including scheduling consultative examinations, if necessary. *Id.* §§ 404.1545(a)(3), 416.945(a)(3). The residual functional capacity must encompass impairments supported by the objective medical evidence in the record and the claimant's credible complaints. *Id.* §§ 404.1545(e), 416.945(e). The ALJ must conduct a function-by-function analysis in assessing a claimant's residual functional capacity; remand may be appropriate in cases where the ALJ fails to consider a claimant's capacity to perform relevant functions, or where the ALJ's analysis contains inadequacies that frustrate meaningful review. *Mascio v. Colvin*, 780 F.3d 632, 635–36 (4th Cir. 2015). The evaluation must include a discussion of how the evidence supports each conclusion, citing specific medical facts and non-medical evidence, including daily activities and observations. SSR 96-8p.

In weighing Plaintiff's subjective complaints against the evidence in the record, the ALJ engaged in a function-by-function analysis, addressing Plaintiff's limitations and then determining that Plaintiff can perform light work. Tr. 18–21. As Defendant notes, the ALJ addressed Plaintiff's bilateral foot pain, noting that it "caus[es Plaintiff] to spend significant parts of the day reclining, and that Plaintiff could only stand for limited amounts of time.[1] Tr. 19. The ALJ discounted, however, these subjective complaints based on a review of the medical evidence: that in January 2016, Plaintiff's gait was "wnl" or within normal limits, his ankle dorsi flexion and plantar flexion were within normal limits, and he was "able to walk [on his] heels and toes." Tr. 18, 923. The ALJ also noted Plaintiff's "normal bulk and tone to the muscles, . . . intact . . . lower extremity coordination, . . . normal gait, [his] ability to heel and toe walk, no sway with the Romberg sign, . . . negative straight leg raise, intact sensation, and he appeared in

---

[1] The ALJ mistakenly wrote in his decision that Plaintiff could stand for 30 to 40 minutes, when Plaintiff stated that it was 20 to 30 minutes during the October 2016 hearing. *Compare* Tr. 19 *with* Tr. 41. Plaintiff can sit for 30 to 40 minutes. Tr. 41.

no acute distress." Tr. 19.  The record is replete with comments on Plaintiff's ambulation dating back to December 23, 2014: "heel to toe tandem gait is intact, no sway with Romberg sign," Tr. 507; "no gait disturbance," Tr. 505; "gait normal," Tr. 388; "[h]eel, toe walk normal," Tr. 372, 375; and the fact that he has no assistive walking device.  Tr. 72.  On September 2, 2014, almost one year after the alleged onset date, Plaintiff's nutritionist reported that Plaintiff "[c]an walk and walk in pool" and is a chef, cooking steak, fish, pizza, corn, baked potato, rice, green beans, raw carrots, peppers, and spaghetti and baking, suggesting mobility.  Tr. 415–16.  At a doctor's visit on June 15, 2016, Plaintiff stated that he is the "main cook at home."  Tr. 1241.  He also drives, drops off his grandchildren at daycare and school in the morning, dusts, and shares laundry and grocery shopping with his wife.  Tr. 31, 44, 202, 205, 1241.  In May 2015, Plaintiff went camping with his family in western Virginia.  Tr. 746.  He also admitted "dust[ing] off [his] tread mill [sic] and [beginning] to walk EVERY DAY" in effort to lose weight.  Tr. 1050.  The following year, he admitted "trying to fix the shower in his house" and to using a vacuum cleaner—all activities that require full body movement.  Tr. 1227, 1241.  Consequently, the ALJ appropriately considered both Plaintiff's claimed limitations associated with his plantar fasciitis and the evidence in the record that contradicts them allowing for meaningful judicial review and contributing to his assessment of Plaintiff's residual functional capacity.  *See Mascio*, 780 F.3d at 636–37.

### 2.    Migraines

Next, Plaintiff states that the ALJ failed to consider the frequency and duration of his migraines in finding that they were not a severe impairment, and that Plaintiff has the residual functional capacity to perform his past relevant work.  Pl.'s Mem. at 8–10; *see* Tr. 17–18.

At the second step of the ALJ's sequential analysis, Plaintiff must prove that she has a "severe impairment . . . or combination of impairments which significantly limits [his] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).  Under the Social Security Act, a severe impairment that entitles one to benefits must cause more than a minimal effect on one's ability to function.  *Id.*  Likewise, "[a]n impairment or combination of impairments is not severe if it does not significantly limit[ Plaintiff's] physical or mental ability to do basic work activities" or "be expected to last for a continuous period of at least 12 months." *Id.* §§ 404.1509, 404.1521(a), 416.909, 416.921(a).  Plaintiff has the burden of demonstrating that his impairment is severe.  *See Bowen v. Yuckert*, 428 U.S. 137, 146 (1987).  If Plaintiff "do[es] not have a severe medically determinable physical or mental impairment that meets the duration requirement in [§§ 404.1509 and § 416.909], or a combination of impairments that is severe and meets the duration requirement[,]" the ALJ must find that he is not disabled.  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

Plaintiff cites several cases in support of his argument, but none are applicable to the facts of this case.  In *Fetter v. Commissioner*, No. 15-2250-JMC, 2016 WL 3646850, at *2 (D. Md. July 7, 2016), the court held that the ALJ did not consider whether the plaintiff's migraines would impact her ability to complete tasks at work.  Not so here.  The ALJ acknowledged Plaintiff's "reported migraines, which last at least eight hours, but up to two days" and require him to be in the dark while undergoing one. Tr. 19, 47.  But the ALJ also noted that Plaintiff's addiction to opiates contributes to the migraines.  Tr. 19, 41, 924–25, 992.  In addition, Plaintiff takes the same medication for them as he did while working—and has for ten years—and thus was able to function at work with the migraines; no side effects from his medication would prevent him from doing so now.  Tr. 18, 39, 49, 504.  In 2014, Plaintiff

8

deferred brain imaging and reported "no change in his HA [headache] character for years."  Tr. 507.

   While the ALJ did not mention Plaintiff's absences at Rite Aid, his last held position, to which Plaintiff testified during the hearing, *see* Tr. 49, there is ample evidence in the record suggesting that these absences were not due to an increase in the severity of his migraines.  First, Plaintiff has suffered from migraines since he was 12.  Tr. 47.   While he may experience photophobia, phonophobia, and nausea with a migraine, those symptoms were only reported in December 2014, and Plaintiff informed his doctor at the time that his migraines had not changed in character from when he was 12.  Tr. 504.  Second, Plaintiff stated that Excedrin and Imitrex "improved" his headaches.  Tr. 504; *see Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling.") (citation omitted).  Although the amount of migraines may have increased as he aged, he also admitted that while working at Rite Aid, his migraines were "[a]bout the same, maybe—maybe a scooch less" than the ones he now experiences.  Tr. 48.  When asked to confirm this assessment, Plaintiff stated that they were "[a] little bit" better while at Rite Aid, "[m]aybe because [he] was upright more[,]" indicating that if there was any exacerbation of his migraines after December 6, 2013, it was due to the positioning of his body.  *Id.*  Therefore, Plaintiff's suggestion that he would frequently be absent from work due to migraines is not supported by record evidence.  *See* Pl.'s Mem. at 10.

   *Muir v. Astrue*, No. Civ. SKG-11-2041, 2013 WL 140779, at *9 (D. Md. Jan. 3, 2013), *Laroche v. Berryhill*, No. TMD 16-3214, 2018 WL 1243545, at *6 (D. Md. Mar. 9, 2018), and *Thrower v. Colvin*, No. 5:15-cv-290-FL, 2016 WL 4734355, at * (E.D.N.C. June 23, 2016) are equally distinguishable from this case.  In *Muir*, the ALJ did not explain how the record evidence

supported his decision that the claimant's migraines did not preclude him from performing sedentary work.  Here, however, it is clear from the record that there is substantial evidence to support the ALJ's assessment of Plaintiff's migraines, and that the ALJ did not selectively discuss only the evidence that favors his conclusion, as was done in *Laroche*.  Rather, the ALJ noted Plaintiff's subjective complaints at the hearing but did not find them credible in light of the medical evidence and Plaintiff's discussions about his migraine history elsewhere in the record.  Likewise, the ALJ did not fail to review Plaintiff's migraines in his decision, relying upon the evidence to substantiate why he did not find them a severe impairment, unlike in *Thrower* where the ALJ barely mentioned the claimant's migraines and provided no explanation for crediting some evidence over other.  The ALJ in this case also considered what the ALJs in *Fetter*, *Muir*, *Laroche*, and *Thrower* did not: Plaintiff's ability to function at work.  Despite having the burden of showing that his migraines are severe, Plaintiff's medical records and self-reporting to his doctors fail to demonstrate that the migraines "significantly limit[ his] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c), 416.920(c).  In light of Plaintiff's history of migraines and his capacity to work with them for at least 19 years with the same symptoms he now experiences, *see* Tr. 191, the ALJ appropriately discounted Plaintiff's description of his migraines during the hearing and found that they are not a severe impairment.  Tr. 17–18.

### 3.   Right Upper Extremity

Third, Plaintiff argues that the ALJ failed to explain his conclusion that Plaintiff could "frequently reach overhead, handle, and finger with the right upper extremity."  Tr. 18; Pl.'s Mem. at 10.  Plaintiff states that an osteochondral fracture of the right radial head and right lateral epicondylitis has limited movement of his right upper extremity.  *Id.* at 11.  Since undergoing surgery on his right elbow in May 2016, he has also experienced difficulty with grip

and severe right thumb pain, with numbness and tingling while reaching; he assesses that he has about ten-percent-use of his right arm. *Id.*; Tr. 50.

Social Security Ruling 96-8p requires the residual functional capacity assessment to "include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations)." *Mascio*, 780 F.3d at 636 (citing SSR 96-8p). The ALJ did just that. In his decision, he acknowledges Plaintiff's complaints of "right shoulder and elbow pain, with continued hand numbness." Tr. 20 (citing Tr. 992, 1168, 1236). But he refers to the medical records, which contradict Plaintiff's self-assessment and demonstrate that Plaintiff's complaints have spanned ten years. Tr. 20, 1168. In fact, Plaintiff admits that his right elbow pain "[s]tarted after intensive guitar playing over a several month period." Tr. 380–81. In 2011, he declined cortisone injections but received them the following year with "no real relief." Tr. 379, 381. In February 2013, Dr. Al-Muhannad Al-Hammood ("Dr. Al-Hammood") described Plaintiff as someone with "chronic pain syndrome related to R [right] tennis elbow pain." Tr. 389.

After the alleged onset of his disability, doctors documented the following: no edema in 2014, *see* Tr. 322, no pitting edema and intact range of motion "in all extremity" in 2015, Tr. 474, and the "lateral epicondyle . . . [had] a normal appearance with no evidence of soft issue or bony edema" in 2016 prior to his surgery. Tr. 921. While Plaintiff's doctor reported that "[t]here is some very subtle increased signal at the flexors of the medial condyle[,]" she also noted that this is "consistent with very mild medial epicondylitis." *Id.* Plaintiff's elbow joint effusion was "small" and his ulna and humerus "unremarkable." *Id.* His upper extremities were also all "wnl" or within normal limits, including his hand grip in 2016 prior to his surgery. Tr. 993.

Likewise in 2016, Plaintiff's doctor reported that both his shoulder and elbow had "full range of motion," *see* Tr. 1170, 1180, and "good" range of motion, *see* Tr. 1236, despite "tenderness over [the] lateral epicondyle" and "pain with resisted wrist extension in elbow extension." Tr. 1170. The elbow joint was also "generally preserved," and the "neurovascular structures in the field-of-view show[ed] no acute finding[, . . .] abnormal muscle atrophy[, . . .] acute fracture or dislocation." Tr. 1262–64.

On the day of his surgery, Plaintiff had "[f]ull active movement of all extremities with no joint pain, swelling[,] or tenderness." Tr. 1204–05, 1208. After the surgery, Plaintiff's doctor recorded that he had "no edema," Tr. 1228, his wound had healed, and that his "range of motion" was good. Tr. 1236. Plaintiff commenced his regular activities less than two weeks after the operation and before his splint was removed. Tr. 1227, 1241. He noted feeling pain while performing these activities (fixing a shower and cutting chicken) but had "no acute complaints otherwise." Tr. 1227, 1241. His doctor referred him to occupational therapy. Tr. 1236–39. A few weeks later, Plaintiff stated that his pain was "much better now," and that it "gradually even[ed] out" and denied any numbness or tingling sensation. Tr. 1241. He did note "severe difficulty with making a grip" and "occasional[ly] sharp" pain with elbow motions but was capable of performing shoulder circles, scapular retraction, active elbow flexion within "pain free range," active wrist pronation and supination within "pain free range," and active shoulder external rotation with his arm in a scapular pane during a medical visit. Tr. 1241–42.

The following month, Plaintiff stated that he no longer had shoulder pain—only "increased thumb pain, numbness/tingling sensation with reaching to grab, pick up objects," but his doctor confirmed this was "not related to elbow surgery." Tr. 1311–12. Consequently, Plaintiff's use of his right upper extremity is not limited as he suggests, and there is substantial

evidence in the record to support the ALJ's finding that Plaintiff can frequently reach, handle, and finger.  Tr. 18; Pl.'s Mem. at 10–11; Def.'s Mem. of Law in Supp. of Def.'s Mot. for Summ. J. & in Opp'n to Pl.'s Mot. for Summ. J. [hereinafter Def.'s Mem.] at 21–22 (Dkt. No. 13).

### 4.      Combination of Impairments

Plaintiff subsequently states that the ALJ did not adequately consider the combined impact of all of his impairments.  Pl.'s Mem. at 11–13.  Despite the fact that he was also diagnosed with asthma, urinary incontinence, prostatitis, epididymitis, epididymalgia, benign prostatic hypertrophy, lower urinary tract symptoms, male pelvic pain, *see* Tr. 425, degenerative disc disease, Tr. 401–02, osteoarthritis of the knees, Tr. 924, and umbilical and bilateral inguinal hernias, Tr. 560, Plaintiff argues that the ALJ neglected to address them in detail and make a "particularized finding" on the combined effect of Plaintiff's impairments.  Pl.'s Mem. at 12–13.

Pursuant to 42 U.S.C. § 423(d)(2)(B), the Commissioner of Social Security must "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity[,]" and the ALJ shall do the same, sufficiently explaining his evaluation of the combined effect of all physical impairments.  *See, e.g.*, *Hines v. Bowen*, 872 F.2d 56, 59 (4th Cir. 1989) (collecting cases).  As Defendant notes, the combined effect rule "merely elaborates upon the general requirement that an ALJ [must] explicitly indicate the weight given to relevant evidence."  *Id.*  Thus, by explaining the weight allocated to such evidence, the ALJ demonstrates that he sufficiently considered the combined effect of the claimant's impairments.  *Id.*

Here, the ALJ did so, acknowledging that "[w]hile there are diagnoses of such impairments on the record, they do not more than minimally affect the claimant's ability to engage in basic work activities."  Tr. 17.  First, "evidence of diagnosis alone is insufficient to

establish disability." *Cobb v. Colvin*, No. 2:15-cv-161, 2016 WL 8199316, at *4 (E.D. Va. Mar. 3, 2016) (citing *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986)).  It is the functional limitations that a diagnosis may cause that are significant.  *Id.*  Second, Plaintiff was diagnosed with asthma before the alleged onset date of his disability and experienced its effects while working, often described as an asthma "persistent" patient.  *See* Tr. 358, 368, 371, 379, 382, 389–90.  On February 9, 2013, for example, Plaintiff's doctor stated that Plaintiff's last nebulizer treatment was at 2:00 a.m., and that Plaintiff was positive for nasal congestion, cough, shortness of breath, and sputum changes, but Plaintiff resigned from his job at Rite Aid and applied for disability insurance benefits ten months after that doctor's visit.  Tr. 387.  That same report also provided that Plaintiff was not wheezing.  *Id.*  There is no indication in the record that his asthma has changed in severity since December 6, 2013.  *See Craig v. Chater*, 76 F.3d 585, 596 n.7 (4th Cir. 1996) (concluding that plaintiff could not be found "disabled without a claim of significant deterioration of her condition . . . from the time when she was admittedly able to work").

Within two weeks of the alleged onset of his disability, Plaintiff received diagnostic imaging relating to "asthma exacerbation," but his doctor did not see any "acute abnormality." Tr. 395–96.  That month, he claimed to experience "persistent wheezing and mild cough for about [two] weeks," but his doctor attributed that to Plaintiff "running out of his medication." Tr. 329–30.  Plaintiff continues to take the same medications prescribed before the alleged onset of his disability and the same dosage, including using "one vial in nebulizer along with [one] vial of Albuterol every six hours."  *Compare* Tr. 254, 359–60, 381–82, 389–90 *with* Tr. 250, 323, 419, 470, 473; *see* Pl.'s Mem. at 12.

The ALJ properly explained that listing 3.03 requires Plaintiff's asthma to consist of "chronic asthmatic bronchitis or attacks in spite of prescribed treatment requiring physician intervention at least once every two months or six times in a year" to be considered severe.  Tr. 18; 20 C.F.R. Part 404, Subpart P, Appendix 1.  At the hearing, Plaintiff said that his asthma is "controlled."  Tr. 54.  He denied "sob, cp" or shortness of breath and chest pain.  Tr. 418.  He also admitted smoking cigars during the relevant period, 15 years before adjudication of his claim for disability insurance benefits.  *See* 20 C.F.R. § 404.1560; Tr. 322, 358.  His doctors found that in addition to not wheezing, Plaintiff was "alert, well appearing, and in no distress." Tr. 322.

Third, Plaintiff has suffered from urinary frequency since 2000, which the ALJ noted. Tr. 18, 36, 425.  Plaintiff testified that after undergoing back surgery that year, he began to experience problems with his bladder and started using a catheter.  Tr. 36.  Thus, Plaintiff was capable of working with "protracted frequency, urgency, [and] nocturia."  Tr. 425.  Further, his pelvic pain—associated with prostatitis, epididymitis, prostadynia, epididymalgia, benign prostatic hypertrophy, and lower urinary tract symptoms—was alleviated with antibiotics.  Tr. 424, 429–31.  During a follow-up cystoscopy in 2014, Plaintiff's results were "normal" with "[n]o explanation for pelvic pain symptoms."  Tr. 422.  In 2016, Plaintiff had no problems with "urination or holding on to bowel or bladder."  Tr. 923.  Plaintiff also failed to include any of these impairments in his disability report dated April 16, 2014 when his doctor mentioned them almost two months prior and did not discuss them at the administrative hearing despite the ALJ asking if there was "anything else about [his] condition" that was not discussed.  Tr. 35, 55, 66, 77–78, 185, 425.  In fact, Plaintiff's response was that the ALJ had "pretty much covered . . . everything that is going on with [him] right now. . . . I think that's pretty much it."  Tr. 55.

When the ALJ repeated his question, Plaintiff answered, "Yeah, um, I think that—that covers if not everything, the vast majority of it."  Tr. 56.  Moreover, his disability reports dated October 22, 2014 and January 5, 2015 asked if he had "any new illnesses, injuries, or conditions since [he] last completed a disability report[,]" and none of the above ailments were added.  Tr. 213, 222.

Fourth, Plaintiff has a history of discectomy, suffering from "worsening LBP" or lower back pain since before the alleged onset of his disability.  Tr. 401–02, 920–21.  In 2000, he underwent back surgery to reduce the pain.  Tr. 924.  He cites a doctor's visit on May 8, 2013, which identifies degenerative disc disease at L3-L4, small disc osteophyte complex at L4-L5, and pain "unrelieved by conservative measures."  *Id.*  Yet, Plaintiff continued to work seven additional months until applying for disability.  The ALJ acknowledged Plaintiff's back impairment and related surgery.  Tr. 19.  But also stated that there was no edema or tremors, Tr. 322, 507; a non-tender spine, Tr. 507, 923; no problems with bones or joints, Tr. 322, 923; negative straight leg raise, Tr. 923; normal bulk and tone to his muscles, Tr. 507; no sway with the Romberg sign, *id.*; and a gait within normal limits, as Plaintiff was "able to walk [on his] heels and toes."  Tr. 507, 923.  As noted above, Plaintiff was also reported to be "alert, well appearing, and in no distress."  Tr. 322.

Fifth, while Plaintiff's doctor may have noted that Plaintiff had osteoarthritis in his knees, at that same doctor's visit, Plaintiff's knee extension was within normal limits.  Tr. 923–24.  And, while Plaintiff suffered from a hernia in 2014, Tr. 560, it was surgically repaired the following year in October.  Tr. 840–42, 871.  When he inquired about an earlier surgery in July 2015, his doctor replied that "there is no great urgency with hernias, unless they are getting stuck and very painful[,]" and Plaintiff opted to wait the three months.  Tr. 1044.  During that period of

16

time, as Defendant notes, Plaintiff "dusted off [his] tread mill [sic] and began to walk EVERY DAY in an effort to change [his] life style [sic]," Tr. 1050, and went fishing with his grandson. Tr. 1085–86. After his surgery, Plaintiff had "minimal pain." Tr. 871. Accordingly, it cannot be said that the ALJ failed to consider Plaintiff's multiple impairments in combination with each other. *See* Pl.'s Mem. at 13. The ALJ weighed the relevant evidence in the record, including Plaintiff's subjective complaints and in so doing considered the cumulative effect of each condition. *See Smith v. Commissioner*, No. , 2010 WL 1640271, at *3 (E.D. Va. Apr. 22, 2010) ("While an ALJ is required to consider all of the relevant evidence in the record, there is no requirement that the ALJ expressly discuss each piece of that evidence. . . . Indeed, such a requirement, if it existed, would impose an insuperable burden on the adjudicatory system of the Social Security Administration.") (citation omitted).

### 5.     State Agency Opinions

Plaintiff next argues that the ALJ erred by according great weight to the state agency physicians who did not have a complete record before them at the time of their assessments. *See* Pl.'s Mem. at 13–15. But merely because these physicians did not have access to additional evidence does not render their opinions erroneous. *See, e.g.*, *Hunter v. Berryhill*, No. 3:17-cv-112-DJN, 2018 WL 310138, at *10 (E.D. Va. Jan. 5, 2018) (citations omitted). "State agency medical . . . consultants are highly qualified and experts in Social Security disability evaluation." 20 C.F.R. § 404.1513a(b)(1). The Fourth Circuit's jurisprudence "contemplate[s] the possibility" that a treating physician's medical opinion "may be rejected in particular cases in deference to conflicting opinions of non-treating physicians." *Campbell v. Bowen*, 800 F.2d 1247, 1250 (4th Cir. 1986). While the ALJ often "give[s] more weight to medical opinions from . . . treating sources, since these sources are likely to be the medical professionals most able to

provide a detailed, longitudinal picture of [Plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations[,]" but that "treating source's medical opinion on the issue(s) of the nature and severity of [Plaintiff's] impairment(s)" must be "well-supported by medically acceptable clinical and laboratory diagnostic techniques and . . . not [be] inconsistent with the other substantial evidence in [Plaintiff's] case record."  20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).

Here, Plaintiff's treating physician, Dr. Al-Muhannad Al-Hammood's medical opinion regarding Plaintiff's limitations is inconsistent with the other substantial evidence in the record, therefore permitting the ALJ to give authority to the non-treating sources' opinions, which are based on that same evidence in the record.  As the ALJ notes, Dr. Al-Hammood does not explain, for example, how Plaintiff's medical conditions have "greatly imped[ed] his ability to work" nor acknowledge that Plaintiff suffered from these conditions before the alleged onset date of his disability.[2]   Tr. 20–21, 256.   The state agency physicians, on the other hand, recognized Plaintiff's diagnoses but found that his medical visits and conservative treatment were not consistent with his complaints.  Tr. 66–75, 77–86.  First to review Plaintiff's claim was Dr. Margaret Burke who found that despite Plaintiff having "a number of various [and] sundry impairments[,]" each was controlled through medication or surgery.  Tr. 69.  Significantly, Dr. Burke considered Plaintiff's daily activities as the most informative in assessing Plaintiff's credibility.  Tr. 70.  These are especially telling, considering Plaintiff was capable of exercising, fishing, swimming, camping, grocery shopping, cooking, cleaning, and repairing a shower—all

---

[2] Significantly, Plaintiff does not challenge the ALJ according little weight to Dr. Al-Hammood's opinion.  Tr. 20–21.

while suffering from several disabling conditions, suggesting that his pain was not as severe as he alleged. Tr. 31, 44, 72, 202, 204–05, 415, 746, 1050, 1227, 1241.

On November 20, 2014, Dr. Robert Weisberg conducted a second state agency disability determination. Tr. 77–86. Similar to Dr. Burke, Dr. Weisberg found Plaintiff's daily activities inconsistent with his subjective complaints, and that any exertional limitations were due to his anemia. Tr. 82. The medical records Drs. Burke and Weisberg were not able to review do not demonstrate any drastic changes in Plaintiff's conditions. Rather, they show consistency with the state physicians' analyses: no edema, Tr. 322, 507; good range of motion, Tr. 1236; a non-tender spine, Tr. 507, 923; no problems with bones or joints, Tr. 322, 923; negative straight leg raise, Tr. 923; normal bulk and tone to his muscles, Tr. 507; no sway with the Romberg sign, *id.*; a gait within normal limits, Tr. 507, 923; and Plaintiff "in no distress." Tr. 20, 322. Therefore, the inability of Drs. Burke and Weisberg to consider the complete record has no bearing on whether Plaintiff is disabled. While a majority of the record postdated the two assessments, no significant changes to his conditions are reflected in these 892 pages. Consequently, substantial evidence supports the ALJ's decision to afford great weight to Drs. Burke and Weisberg's disability determination.

### B.  Plaintiff's Credibility

Plaintiff also argues that the ALJ failed to properly evaluate his testimony regarding the intensity and persistence of his pain. Pl.'s Mem. at 17. This Court does not "make credibility determinations, or substitute [its] judgment for that of the Secretary." *Craig*, 76 F.3d at 589. Instead, the Court reviews the ALJ's credibility assessment for substantial evidence. *See Johnson v. Barnhart*, 434 F.3d 650, 658 (4th Cir. 2005).

In evaluating a claimant's credibility, the ALJ must first determine whether there is a medically determinable impairment that could "reasonably be expected to produce the pain or other symptoms alleged" and next the "intensity, persistence, and limiting effects" of that individual's symptoms.  *See* 20 C.F.R. §§ 404.1529(b)–(c), 416.929(b)–(c).  During the second step, the ALJ must consider objective medical evidence and any other information that a claimant provides about his or her symptoms, including (1) daily activities; (2) the location, duration, frequency, and intensity of pain and other symptoms; (3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; (5) treatment, other than medication, that is received for relief of pain or other symptoms; (6) any measures employed to relieve pain or other symptoms; and (7) other factors concerning functional limitations and restrictions due to pain or other symptoms.  20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).  The ALJ must weigh a claimant's "statements about the intensity, persistence, and limiting effects" of her symptoms against the objective medical evidence and other evidence to determine disability.   20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4).  The ALJ may only accept a claimant's symptoms as described if they are "consistent with the objective medical evidence and other evidence," but cannot reject his statements about the intensity and persistence of his pain or the effect of his symptoms on his ability to work "solely because the available objective medical evidence does not substantiate [the claimant's] statements."  20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

Plaintiff's reference to *Hines v. Barnhart*, 453 F.3d 559, 562 (4th Cir. 2006) is limited and fails to acknowledge this standard.  *See* Pl.'s Mem. at 15–16.  While "pain itself can be disabling," Plaintiff self-reported several times that was not the case.  *See, e.g.*, *Hines*, 453 F.3d at 564 (citing *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989)).  As noted above, he denied

shortness of breath, chest pain, and palpitations.  Tr. 418.  He stated that antibiotics helped his

pelvic pain.  Tr. 424.  After his hernia was surgically repaired, he reported "minimal pain" in

November 2015.  Tr. 871.  The day of his right elbow surgery in May 2016, he stated that he had

"[f]ull active movement of all extremities with no joint pain, swelling[,] or tenderness."  Tr.

1204–05, 1208.  After that surgery, in June 2016, he informed his physician that his pain was

"much better now," and that it "gradually even[ed] out" and denied any numbness or tingling

sensation.  Tr. 1241.  He was also able to perform shoulder circles, scapular retraction, active

elbow flexion within "pain free range," active wrist pronation and supination within "pain free

range," and active shoulder external rotation with his arm in a scapular pane during a medical

visit.  Tr. 1242.  In July 2016, he no longer had any shoulder pain.  Tr. 1311.  Thus, it is not that

the ALJ "required . . . objective evidence" to "substantiate the intensity, persistence, and limiting

effects of [Plaintiff's] subjective complaints[,]" but that Plaintiff's own subjective evidence

supported a finding of no disability.  Tr. 20–21; Pl.'s Mem. at 17.

       Here, the ALJ found that Plaintiff's medically determinable impairments could

reasonably be expected to cause the alleged symptoms, but that his "statements concerning the

intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with

the medical evidence and other evidence in the record . . . ."  Tr. 19.  The ALJ referenced

particular activities—swimming, walking, caring for his grandchildren, camping, making home

repairs, cooking, cleaning, and driving—in which Plaintiff engaged after the alleged onset of his

disability that would not be possible given Plaintiff's subjective complaints.  Tr. 21.  In addition,

the ALJ noted inconsistencies between Plaintiff's statements and the evidence in the record.  For

example, Plaintiff stated in his function report dated July 28, 2014 that he "cannot work on the

house, indoor or outdoor[,]" "no longer do[es] any indoor or outdoor chores that require[] lifting,

squat[t]ing, pushing, carrying, yardwork, home maintenance." Tr. 203–04.  But on June 2, 2016, Plaintiff reported "trying to fix the shower in his house" to his physician.  Tr. 1227.  When asked about this activity at the administrative hearing only four months later, Plaintiff could not recall "what fix would be" because he does not "know how to fix showers" but maybe he meant that he had cleared the drain from any clogs—an action that presumably requires either squatting, bending, reaching, sitting, or kneeling—all of which Plaintiff stated his conditions affect.  Tr. 56–57, 207.  Moreover, on June 15, 2016, Plaintiff discussed "pushing" a small vacuum cleaner after he clearly provided that he could not engage in this activity.  *Compare* Tr. 204 *with* Tr. 1241.  Plaintiff also noted in his function report that he "no longer camp[s because] that just creates way too much pain."  Tr. 203.  But less than one year later—on May 11, 2015—Plaintiff informed his doctor that he was "taking the family camping in western VA."  Tr. 746.  At the hearing, however, he told the ALJ that he had not been anywhere since December 2013.  Tr. 45. He had also gone fishing with his grandson in the Shenandoah region in August 2015.  Tr. 1086. Plaintiff even stated in his function report that he could not engage in these very activities. *Compare* Tr. 203–04 *with* Tr. 746, 1227, 1241; Pl.'s Mem. at 19.

He further stated in the function report that his cooking habits had changed since the alleged onset of his disability because he did not "have the strength to stand up for long period[s] of time[,]" Tr. 204, but two months later, Plaintiff's nutritionist reported that he "[c]an walk and walk in pool[,]" though his walking is limited, and is a chef.  Tr. 415–16.  Specifically, Plaintiff "cooks dinner – steak/fish – 8 ounces, pizza, corn, baked potato, rice, once in a while green beans, raw carrots, peppers, [and] spaghetti" and bakes.  Tr. 416.  At the hearing, Plaintiff acknowledged "cook[ing] a little bit" but being unable to chop anymore," which is not suggested by Plaintiff's meal preparation.  *Compare* Tr. 44 *with* Tr. 416.  And, in June 2016, Plaintiff

admitted to "chopping a chicken the other day" and being the "the main cook at home."  Tr. 1241.  From the above, it is indisputable that the ALJ here, unlike the ones in *Woods v. Berryhill*, 888 F.3d 686, 694–95 (4th Cir. 2018) and *Brown v. Commissioner*, 873 F.3d 251, 263–64 (4th Cir. 2017), considered the extent of Plaintiff's activities but found that these activities, as described by Plaintiff, were not as limited as Plaintiff now expresses.  Tr. 21; *see* Pl.'s Mem. at 19–20.  In both *Woods* and *Brown*, for example, the plaintiff only prepared simple meals or meals in a microwave, respectively, which is clearly not the case here.  888 F.3d at 694; 873 F.3d at 263.

The ALJ here also concluded that the consistent use of medication and doctor-recommended therapy was "largely conservative in nature."  Tr. 21.  The fact that (1) Plaintiff took the same medication before the onset of his alleged disability as after it, *compare* Tr. 254, 359–60, 381–82, 389–90 *with* Tr. 250, 323, 419, 470, 473, and (2) had no decreased range of motion, edema, and tremors, as would be expected with the degree of limitation alleged, but rather a normal gait, full muscle strength, intact sensation, and a non-tender spine all contributed to the ALJ's finding that Plaintiff does not have the functional limitations described.  Tr. 20–21; SSR 16-3p (providing examples of objective medical evidence related to intensity, persistence, and limiting effects of pain as "reduced joint motion, muscle spasm, sensory deficit, and motor disruption").  And certainly, the ALJ is permitted to rely upon such objective evidence in evaluating the intensity and persistence of Plaintiff's pain.  *See* 42 U.S.C. § 423(d)(5)(A) ("Objective medical evidence of pain or other symptoms established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether the individual is under a disability."); *Craig*, 76 F.3d at 595 (requiring ALJ consideration of objective medical evidence of pain in addition to

Plaintiff's subjective complaints).  Consequently, the ALJ did not apply an incorrect standard in evaluating the record evidence.

### C.       Plaintiff's Past Relevant Work

Finally, Plaintiff argues that the ALJ did not properly assess whether Plaintiff is capable of performing his past relevant work because he erred in his finding of Plaintiff's residual functional capacity, and that as a result, Plaintiff cannot be a cashier because that requires frequently reaching, handling, and fingering objects.  Pl.'s Mem. at 21–23.  But as already discussed, this Court deems the ALJ's analysis of Plaintiff's residual functional capacity to be proper.  *See supra*, at 5–19.  Plaintiff then notes that because he only worked as a procurement agent from 1994 to 2001, Tr. 22, that position did not qualify as past relevant work because Plaintiff was not a procurement agent within the 15 years prior to the ALJ's decision, required under 20 C.F.R. § 404.1565(a).  Pl.'s Mem. at 21–22.  Past relevant work only includes that which was done "15 years or more prior to the time of adjudication of the claim."  SSR 82-62.  Accordingly, Plaintiff is correct that the procurement agent position is not considered relevant work because at the time of adjudication of the claim on January 11, 2017, Plaintiff had not worked as a procurement agent within the past 15 years.  Even given the mistake, the error is harmless because as discussed below, Plaintiff can perform the responsibilities of a real estate agent.     *See   White   v.   Colvin*,   No.   5:13-cv-757-RN,   2015   WL   1438747,   at   *3 (E.D.N.C. Mar. 27, 2015) (finding harmless error where the plaintiff could perform other past relevant work).

Plaintiff next addresses his past relevant work as a real estate agent, stating that because his license expired on May 31, 2008, he does not have the qualifications required to perform such a job.  Pl.'s Mem. at 22.  In assessing Plaintiff's ability to perform his past relevant work,

the Commissioner may rely on the general job categories of the Dictionary of Occupational Titles as presumptively descriptive of a claimant's prior work. *See* SSR 82-61 ("The Dictionary of Occupational Titles ("DOT") descriptions can be relied upon—for jobs that are listed in the DOT—to define the job as it is usually performed in the national economy."). Moreover, agency rulings specifically contemplate "that some individual jobs may require somewhat more or less exertion than the DOT description." *Id.* Further, the regulations provide that the ALJ may use the services of a vocational expert or look to the DOT when determining the demands of Plaintiff's past relevant work and whether his residual functional capacity allows him to perform such work. 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2) ("We may use the services of vocational experts or vocational specialists, or other resources, such as the 'Dictionary of Occupational Titles' . . . to obtain evidence we need to help us determine whether you can do your past relevant work, given your residual functional capacity."). The test for evaluating Plaintiff's past relevant work experience is not whether he may perform the heightened demands of his actual position, but the demands as generally required by employers throughout the economy. SSR 82-61. "[I]f the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the claimant should be found to be 'not disabled.'" *Id.*

Here, Plaintiff argues that merely because he let a license expire that he is disabled. But that is not true. As Defendant notes, a disability can only be found if there is an "inability to engage in any substantial gainful activity *by reason of any medically determinable physical or mental impairment* which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A)

25

(emphasis added); Def.'s Mem. at 29 (citing *Garrison v. Colvin*, 564 F. App'x 374, 378 (10th Cir. 2014) (finding the plaintiff's argument that he cannot return to his past work as a card dealer or supervisor of a card room because of his inability to pay for a gaming license irrelevant to whether the plaintiff is disabled). Plaintiff left his job as a real estate agent, however, because "the market crashed." Tr. 34. He stated that he "could have worked through the bubble but . . . was only there a couple of years and . . . [he] had very, very few clients . . . ." Consequently, there is no dispute that Plaintiff's medically determinable physical or mental impairments did not impact his ability to be a real estate agent.

**V.    Recommendation**

For the reasons set forth above, the Court recommends that Plaintiff's Motion for Summary Judgment (Dkt. No. 10) be DENIED, that Defendant's Motion for Summary Judgment (Dkt. No. 12) be GRANTED, and that the final decision of the Commissioner be AFFIRMED.

**VI.    Notice**

The parties are notified as follows. Objections to this Report and Recommendation must be filed within fourteen (14) days of service on you of this Report and Recommendation. Failure to file timely objections to this Report and Recommendation waives appellate review of the substance of the Report and Recommendation and waives appellate review of a judgment based on this Report and Recommendation.

/s/
Michael S. Nachmanoff
United States Magistrate Judge

August 31, 2018
Alexandria, Virginia